UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

ZEREGA AVENUE REALTY CORP. and   :
FRED TODINO & SONS, INC.,
                                 :
                    Plaintiffs,        **OPINION AND ORDER**
                                 :
         -against-                     04 Civ. 9651 (KNF)
                                 :
HORNBECK OFFSHORE
TRANSPORTATION, LLC.,            :

                    Defendant.   :
-------------------------------------------------------X

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

This is an action for damages, brought under the court's admiralty and maritime

jurisdiction, 28 U.S.C. § 1333, arising out of the alleged negligent operation of a tug and a barge

owned and operated by the defendant.  According to the plaintiffs, due to an allision of the tug,

the barge or debris carried by the barge with the plaintiffs' bulkhead structure[1] on the

Westchester Creek, in Bronx County, New York, the bulkhead structure collapsed, causing

damage to the plaintiffs' property.

Pursuant to 28 U.S.C. § 636(c), the parties consented to having a non-jury trial of this

action, presided over by a United States magistrate judge.  That trial has been completed.  The

following are the Court's findings of fact and conclusions of law, made pursuant to Rule 52 of

the Federal Rules of Civil Procedure.

---

[1] The terms "bulkhead," "relieving platform," "dock," "wharf" and "retaining wall" all
refer to the portion of the plaintiffs' property, along the waterfront, on which a structural collapse
occurred, and are used throughout this opinion interchangeably.

**FINDINGS OF FACT**

Plaintiffs Zerega Avenue Realty Corp. and Fred Todino & Sons, Inc. are corporations which, at all relevant times, owned the premises located at 1000 Zerega Avenue ("Zerega property") in Bronx County, New York.  Zerega property, abutting Westchester Creek, measures approximately 62,000 square feet and contains a bulkhead and a one story office building, with a basement.  Defendant Hornbeck Offshore Transportation, LLC., at all relevant times, owned and operated the tug Stapleton Service ("tug") and the Barge E-2201 ("barge").

On October 29, 2002, pulling the barge on gate lines, the tug was traveling southbound in Westchester Creek.  The barge was approximately 250 feet long and between 50 and 60 feet wide and in a light condition.  Mate Steven Spurlock ("Spurlock") operated the tug, assisted by a trainee Mate, Eric Fuerstinger ("Fuerstinger").  Spurlock testified at trial[2] that, at approximately 3:30 p.m., the tug and the barge were in the immediate vicinity of Zerega property, while waiting for the Unionport Bridge to open.

The Unionport Bridge took longer than usual to open.  As Spurlock waited for the bridge to open, he became concerned that the stern of the barge was coming too close to the retaining wall of the Zerega property.  He maneuvered the tug to starboard in order to straighten the barge.  While he operated the tug, Spurlock could not see the rear end of the barge.  Fuerstinger, who was inside the tug's wheelhouse at that time, also did not have a direct view of the rear of the barge, on the starboard side.  Spurlock testified that the stern of the barge drifted toward the Zerega property's dock.  Spurlock recalled that he was concerned the barge would come into

---

[2] In-court live trial testimony consisted solely of cross-examination, since each witness' direct testimony was presented to the Court, prior to trial, via affidavit or declaration.

contact with the retaining wall because of the narrowness of the channel they were in and, furthermore, if the wind picked up or gusted, the barge, in its light condition, could hit the retaining wall.  Although Spurlock's affidavit containing his direct testimony indicated that the wind, at that time, was very light and blowing from the starboard side, moving the tug and the barge away from Zerega property, he stated in his pretrial deposition testimony that the wind was blowing toward the dock.  Fuerstinger testified that the wind was light and blowing off the dock.  However, Fuerstinger also testified, at his pretrial deposition, that the wind was light, and it may have been blowing toward the dock.  The Court finds that the wind was blowing toward the dock because that direction is consistent with Spurlock's statements about his concerns with the wind and the concomitant actions he took respecting his concerns about the effect of the wind on the barge.

Apprehensive about the wind, Spurlock asked Fuerstinger to check the barge's status. Thereafter, Fuerstinger informed him that the barge was drifting toward the Zerega property retaining wall.  At the time the barge drifted toward Zerega property, Spurlock was looking forward toward the Unionport Bridge opening and did not know whether the barge had come into contact with the retaining wall.  At his deposition, Spurlock stated he would not have felt any contact with the retaining wall if the barge hit it.  According to Spurlock's deposition testimony, Fuerstinger would not have been able to tell, with certainty, whether the barge hit the wall.

Christopher Todino ("Todino") testified that, on October 29, 2002, at approximately 3:30 p.m., he was meeting with Michael Justino ("Justino"), a salesperson for Caterpillar, Inc., in his office, located at the southern end of the office building on Zerega property.  While sitting with Justino at a table, two feet away from the office window, Todino suddenly felt a strong jolt.  He

3

jumped up, looked out the window and observed a barge up against and striking approximately the center of the plaintiffs' bulkhead structure.  He then went outside to the relieving platform and observed the barge, with an inscription "Energy 2201" on its side, proceeding south bound toward the Unionport Bridge, towed by a tug.  Todino also testified that he observed the barge bounce off both sides of the Unionport Bridge.

Justino testified that, while he was meeting with Todino, in the office building on Zerega property, on October 29, 2002, at approximately 3:30 p.m., he felt a jolt.  He looked out the office window immediately and observed a barge up against and striking a portion of the plaintiffs' property.  He exited the office promptly with Todino, and observed the barge being pulled away from the plaintiffs' property.  He also observed the barge swerve back and forth, as it pulled away, and then strike the sides of the Unionport Bridge.

Louis Bruno, an office manager, employed by Fred Todino & Sons, Inc., testified that, during the afternoon of October 29, 2002, at approximately 3:30 p.m., he was working on computer servers in an office located near the center section of the office building on Zerega property, when he felt a thump and heard Todino and Justino yelling in another part of the building that a barge hit the retaining wall.  Louis Bruno saw Todino and Justino hurrying outside.  He went to Todino's office, looked through the window and observed a barge being pulled away by a tug from the bulkhead structure on Zerega property.

Laura Bruno, vice-president of Fred Todino & Sons, Inc., testified that, on October 29, 2002, at approximately 3:30 p.m., she was performing clerical work in an office located in the center section of the office building on Zerega property.  At that time, she heard Todino and Justino yelling, in another office, something to the effect that a barge hit the retaining wall.  She

then went to the photocopy room, across from the office where she was working at the time, and, upon looking through the window overlooking Westchester Creek, observed a barge being pulled away from the bulkhead structure on Zerega property by a tug.  On or prior to November 11, 2002, a significant portion of the bulkhead structure on Zerega property collapsed into Westchester Creek.

Spurlock indicated, through his direct testimony, that he observed a sinkhole and sawhorse barricades just behind the retaining wall on the Zerega property and that the sinkhole grew in size before October 29, 2002.[3]  However, he conceded, during cross-examination, that his pretrial deposition statements that he: (i) never looked at the dock or noticed that the dock was falling apart; (ii) considered the dock and the retaining wall as the same thing and was not able to testify to the condition of the retaining wall; and (iii) was unable to pinpoint with any accuracy where the sinkhole was on the Zerega property were correct.  Spurlock also testified during his deposition that, although he had seen the sinkhole on the Zerega property when he passed it prior to October 29, 2002, he was unable to recall when that passage occurred.  While being cross-examined, Spurlock also confirmed the correctness of this statement.

Fuerstinger, as well noted, in his direct testimony, that he saw a sinkhole on the land behind the dock wall at the Zerega property.  However, at his pretrial deposition, he testified that

---

[3] Portions of the pretrial deposition testimony obtained from Paul Cirillo ("Cirillo") were received in evidence by the Court.  Cirillo testified that: (i) his family owned the Zerega property from the late 1960s to mid-1990s and that, during that time, a sinkhole, approximately four by four feet large, developed every eight to twelve months, at the south end of the relieving platform, which would be filled in by the family; and (ii) he observed a small sinkhole, in the relieving platform of the Zerega property, in July and August of 2002, which grew larger over time.  In light of the totality of the evidence, with respect to the sinkhole, the Court finds that Cirillo's testimony lacked credibility.

he never looked at any part of the Zerega property, aside from the retaining wall, and that Spurlock never said anything to him about the sinkhole.  Under cross-examination, Fuerstinger persisted in his statement that he saw a sinkhole, while acknowledging he could not be one hundred percent sure about what he saw.  A photograph, received in evidence by stipulation, taken in or about January 2002 and depicting the Zerega property from a southward angle, looking towards the Unionport Bridge, including about 60% to 70% of the relieving platform, did not show any sinkholes on the portion of that property depicted.

Stanley M. White ("White"), a professional engineer employed by Ocean and Coastal Consultants Engineering, P.C., testified, as an opinion witness, about the amount of damages arising from the collapse of the Zerega property's wharf structure.  See Fed. R. Evid. 702.  White indicated that, because the relieving platform elements work together, it would not be possible to perform major repairs in-kind to the pile foundation of the platform without causing the other major elements to be similarly repaired.  He testified that approximately 62 linear feet of the relieving platform, situated at the north end of the property, had a concrete deck with several cracks and approximately 21 linear feet of the relieving platform, located to the south, had a large crack and a settling deck.  White estimated, based on his contemplated construction methodology, that approximately 205 linear feet of relieving platform need to be replaced in-kind.  He opined that the probable cost for the marine work needed on the wharf's structure of the Zerega property is $1,450,000, for the fiscal year 2003, including a contingency of 25%, resulting from a lack of final design documents, which would detail the construction and materials to be used in repairing the bulkhead structure.

According to White, the collapse of the wharf structure exposed the foundation of the existing office building on the Zerega property and a visual inspection of the office building, in late 2003, indicated the following structural damage: (1) a vertical crack in the north-end exterior wall; (2) an interior vertical crack, from the floor to the ceiling, in the interior east wall; (3) a horizontal crack, between the recessed windows, in the interior east wall; (4) interior floor slab deterioration, owing to moisture and, settling and cracking adjacent to the east wall; and (5) ceiling deterioration, on the first floor.  White opined that the probable cost to repair the building, including a contingency of 25%, based on a lack of final design documents which would detail the construction and materials to be used in repairing the office building, is $55,353, for the fiscal year 2006.  On cross-examination, White testified that neither he nor his company arrived at a conclusion about the cause of the Zerega property bulkhead collapse and more than one plausible explanation for the collapse existed.

The plaintiffs' expert witness, Steven I. Schneider ("Schneider"), a professional engineer, provided opinion testimony about the causation of the Zerega property bulkhead collapse. Schneider was engaged by the plaintiffs, in 2000, to ascertain the efficacy of converting their property into a transfer facility, with marine loading capability.  He visited the plaintiffs' property more than fifty times between 2001 and 2002.  During that period, Schneider inspected the condition of the Zerega property bulkhead structure, took soundings in Westchester Creek and made several visual inspections of the premises and bulkhead structure.  When he inspected the Zerega property bulkhead structure between 2001 and 2002, he observed that it was comprised of wood pilings, between approximately eight to ten inches in diameter, with a wooden sheathing beneath the piles and a concrete running cap and base.  In the period between 2001 and 2002,

while examining the wood pilings that made up the bulk of the dock structure, Schneider observed the pilings to be in a structurally sound condition.  Based on more than 50 inspections of the Zerega property, his conversations with the plaintiffs and the structurally sound condition of the dock structure, Schneider concluded that the property could be converted into a transfer facility at which barges could dock to load and unload debris and other materials.  Additionally, Schneider testified he inspected the dock structure as late as three months prior to the allision and observed no material damage to the bulkhead structure or the premises at that time.  Schneider stated he never observed any sinkholes on Zerega property.

On or about August 1, 2005, Schneider visited Zerega property and observed a large section of the bulkhead structure was missing.  Upon interviewing Todino, who informed him about a barge's allision with the property on October 29, 2002, Schneider made a visual inspection of the dock structure.  He observed that the sheathing, which typically would have been on the side of the dock structure abutting Westchester Creek, had been ripped off.  Schneider recalled that he last observed the sheathing in July or August 2002 and that a natural occurrence, such as deterioration, sinkholes or age, could not have caused the disappearance of the sheathing.  According to Schneider, the disappearance of the sheathing was crucial in forming his opinion that a barge struck the property.

Schneider also testified that, in the past, he witnessed a wooden pole latch on to a barge and, as the pole was dragged along, it ripped the sheathing off the side of a dock structure.  The damage he observed on Zerega property appeared to be a copy of that event.  Schneider explained that, once the sheathing was ripped off, massive and rapid erosion occurring underneath the surface of the dock structure caused the entire dock structure to fall into Westchester Creek.

Based on his experience, Schneider testified, after the tide in Westchester Creek had gone up and down several times over a period of approximately two weeks, the erosion of the land beneath the dock structure would allow the dock structure to collapse.

Schneider opined, based on witness statements, his inspections of the plaintiffs' bulkhead structure between 2001 and 2005, drawings and photographs he reviewed, reports and videotapes prepared by the defendants he examined and approximately thirty years of engineering experience with marine structures, that the plaintiffs' bulkhead structure collapsed when either: (a) the defendant's barge struck the relieving platform causing the piles to shift and, as the piles moved back, they ripped the planking hardware off the steel, which undermined the relieving platform; or (b) timber or a pole, latched on to the barge, was dragged along the face of the reliving platform, like a stick being pulled along a picket fence, and destroyed the planking which was holding the earth underneath the structure in place, and thus caused the structure to collapse.

## CONCLUSIONS OF LAW

*Liability*

The common law of negligence applies in admiralty and maritime law.  See East River S.S. Corp. v. Transamerica Delaval, 476 U.S. 858, 859, 106 S. Ct. 2295, 2296 (1986).  "It is a well-established proposition of maritime collision law that when a moving vessel collides with a stationary object, 'an inference of negligence arises and the burden is then upon the owners of the vessel to rebut the inference of negligence.'"  Great American Ins. Co. v. Tugs "Cissi Reinauer," 933 F. Supp. 1205, 1217 (S.D.N.Y. 1996) (citations omitted); see The Oregon, 158 U.S. 186,

197, 15 S. Ct. 804, 809 (1895)[4]; The Cullen No. 32, 62 F.2d 68, 70 (2d Cir. 1932).  The

presumption of negligence is sufficient to make a prima facie case of negligence against the

moving vessel.  See Turecamo Maritime, Inc. v. Weeks Dredge No. 516, 872 F. Supp. 1215,

1231 (S.D.N.Y. 1994).

The evidence adduced at trial, including, inter alia, the uncontroverted testimony of:

(i) Todino and Justino that, upon feeling a jolt, they looked out an office window and observed

the barge striking the plaintiffs' property; (ii) Louis Bruno that, upon feeling a thump, he

observed the barge being pulled by a tug away from the Zerega property; and (iii) Laura Bruno

that, upon hearing Todino and Justino yelling, she looked out a window and observed the barge

being pulled away from Zerega property by a tug, establishes that the defendant's barge struck

the plaintiffs' bulkhead structure on October 29, 2002.  The testimony given by these trial

witnesses was credible.  Based on the uncontroverted, credible testimony of the plaintiffs'

witnesses, the Court finds that the defendant's barge collided with the plaintiffs' bulkhead

structure on Zerega property, thus, creating a presumption of negligent operation of the

defendant's vessel and shifting the burden of proof to the defendant to rebut the presumption.

To rebut the presumption of negligence, the moving vessel must demonstrate, by a

preponderance of the evidence, that: (i) it acted with reasonable care; (ii) the allision was the

---

[4] The Court notes that, although the Oregon rule, shifting the burden of proof to the
moving vessel to rebut the presumption of fault, is still good law, its application is in tension
with the Federal Rules of Evidence, which provide that "[t]he burden of persuasion remains with
the party to whom it is allocated under the rules governing the allocation in the first instance."
Fed. R. Evid. 301, 1974 Enactment; see THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME
LAW § 14-3 (4th Ed. 2004).  However, in the instant case, even if the burden of proof remained on
the plaintiffs to establish causation and damages, once an inference of negligence arose, the
plaintiffs met their burden.

fault of the stationary object; or (iii) the allision was an unavoidable accident.  See Texas Eastern Transmission Corp. v. Tug Captain Dann, 898 F. Supp. 198, 207 (S.D.N.Y. 1995).

The defendant contends the collapse of the plaintiffs' bulkhead structure was caused by its deteriorating and unsound condition, including a large sinkhole, allegedly observed on the bulkhead structure at the Zerega property prior to October 29, 2002.  However, the defendant failed to proffer evidence at the trial that would establish, by a preponderance, that the cause of the collapse of the plaintiffs' bulkhead structure was its deterioration and unsound condition.

To show that the plaintiffs' bulkhead structure was in a deteriorating and unsound condition, the defendant relied principally on White's testimony.  However, White, who was engaged by the plaintiffs to provide an expert opinion on the amount of damages arising from the collapse, testified that: (i) his company never came to a concrete conclusion about the cause of the collapse because many pertinent questions remained unanswered; and (ii) a number of possible scenarios existed, which could have provided a cause for the collapse.  White explained that, inasmuch as so many relevant facts remained unknown to him, he never reached a conclusion about the cause of the bulkhead's collapse.  Although White testified that his field investigation demonstrated certain hardware, such as pile caps, bolts, drift pins and fasteners, was missing from the area where the bulkhead structure collapsed, he also testified that it is possible the missing hardware is at the bottom of the creek.  White stated that the damage to the Zerega property was not inconsistent with a dock structure being struck by a piece of debris attached to a barge and that it was most probable that the remaining portion of the bulkhead structure was unstable because of the collapse of a portion of the platform.  The defendant's reliance on

White's testimony to establish causation is misplaced because White stated expressly he could not assign an exact cause to the collapse of the bulkhead structure.

Fuerstinger's testimony that he observed a sinkhole on Zerega property was incredible for the reasons discussed above.  The defendant did not adduce any evidence at the trial to establish that the deterioration and unsound condition of the plaintiffs' bulkhead structure caused its collapse.  Therefore, the defendant failed to rebut the presumption of fault, on the part of the tug and barge, for: (a) striking the plaintiffs' bulkhead structure, through the negligent operation of the vessel; and (b) causing the bulkhead structure's collapse.  The Court finds that the defendant is liable to the plaintiffs for damages arising from the collapse of the plaintiffs' bulkhead structure, caused by the allision of the defendant's vessel with the plaintiffs' bulkhead structure.

*Damages*

Under general maritime law, "[w]here property is destroyed by wrongful act, the owner is entitled to its money equivalent, and thereby to be put in as good position pecuniarily as if his property had not been destroyed."  Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 155, 45 S. Ct. 465, 467 (1925); see The Baltimore, 75 U.S. 377, 385-86 (1869).

The plaintiffs seek damages as follows: (a) $1,450,000, for the injured bulkhead structure; (b) $55,353, for the repair of the office building located on Zerega property; and (c) prejudgment interest.  The plaintiffs' expert witness, White, provided an in-kind estimate for the cost of the marine work necessary to repair the bulkhead structure on Zerega property, based on the following tasks: (i) mobilization/demobilization; (ii) demolition and disposal; and (iii) construction of a new platform in-kind.  White also provided a cost estimate for the repair work on the office building on Zerega property, employing a method that uses the unit cost for a

12

particular repair item that includes labor, equipment and materials. Based on the credible record evidence, the Court finds that the defendant is liable to the plaintiffs for damages in the amount of $1,505,353.

*Prejudgment Interest*

"Although the allowance of prejudgment interest in admiralty rests within the discretion of the trial court, 'it should be granted in the absence of exceptional circumstances.'" In the Matter of the Complaint of Rio Grande Transport, Inc. v. Rio Grande Transport, Inc., 770 F.2d 262, 264 (2d Cir. 1985) (quoting Mitsui & Co., Ltd. v. American Export Lines, Inc., 636 F.2d 807, 823 [2d Cir 1981]). The rate of interest that should be applied is also within the trial court's discretion. See Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 311 (2d Cir. 1987). Generally, prejudgment interest "should be measured by interest on short-term, risk-free obligations," such as United States Treasury Bills. New York Marine & Gen. Ins. Co. v. Tradeline, 266 F.3d 112, 131 (2d Cir. 2001). "[I]n admiralty, an award of prejudgment interest is not a punitive measure. Rather, prejudgment interest is a form of compensation intended to make the injured party whole." Rio Grande Transport, Inc., 770 F.2d at 264 (internal citations omitted); see City of Milwaukee v. Cement Div., Nat'l Gypsum Co., 515 U.S. 189, 195-96, 115 S. Ct. 2091, 2095-96 (1995).

No evidence was presented to the Court to demonstrate that extraordinary circumstances exist, in the instant case, to bar a prejudgment interest award and the Court finds none. Therefore, the plaintiffs are entitled to prejudgment interest. Prejudgment interest should be calculated based upon the average interest paid on six-month United States Treasury Bills, from the date of the allision, October 29, 2002, until the date the judgment is entered in this action.

The interest shall be compounded annually.  See, e.g., OT Africa Line Ltd. v. First Class Shipping Corp., 124 F. Supp. 2d 817, 823-24 (S.D.N.Y. 2000).

*Postjudgment Interest*

Postjudgment interest in admiralty cases is governed by the federal statute providing that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961 (a).  Interest is calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [] the date of the judgment."  Id.  Therefore, the plaintiffs are entitled to postjudgment interest, at the rate noted above.

*Costs and Attorneys' Fees*

"Generally, attorneys' fees awards in admiralty suits are discretionary and based on a finding of bad faith."  New York Marine & General Ins. Co., 266 F.3d at 130.  Fed. R. Civ. P. 54(d) informs that, unless otherwise provided by a statute, Federal Rules of Civil Procedure or directed by a court, "costs, other than attorneys' fees shall be allowed as of course to the prevailing party."

In their complaint, the plaintiffs sought costs and attorneys' fees.  However, the plaintiffs failed to submit to the Court any evidence establishing their costs and attorneys' fees.  Therefore, on or before November 6, 2007, the plaintiffs shall submit to the Court competent evidence of the costs and reasonable attorneys' fees they incurred in this action.  On or before November 13, 2007, the defendant shall submit to the Court any reasonableness challenge to the

14

plaintiffs' request and, on or November 15, 2007, any reply shall be submitted to the Court by the

plaintiffs.

Dated: New York, New York          SO ORDERED:
      October 23, 2007

                                                                       KEVIN NATHANIEL FOX
                                                                      UNITED STATES MAGISTRATE JUDGE

15